KEVIN O'GRADY, Haw. Bar #8817
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
Tel: (808) 521-3367
Paralegal1@kevinogradylaw.com

CALEB R. TROTTER, Cal. Bar #305195*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Tel: (916) 419-7111
CTrotter@pacificlegal.org

* *Admitted Pro Hac Vice*
Attorneys for Plaintiffs

*Additional counsel listed on next page*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| DAVID KALAHIKI and LINDA TWITCHELL,<br><br>Plaintiffs,<br><br>v.<br><br>KALI WATSON, in his official capacity as Chairman of the Hawaiian Homes Commission,<br><br>Defendant. | Case No. 1:26-cv-00398-SASP-WRP<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

*Additional counsel for Plaintiffs:*

NOELLE DANIEL, Kan. Bar #29461*
CAITLYN FELLNER, D.C. Bar #90029259**
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
NDaniel@pacificlegal.org
CFellner@pacificlegal.org

*\* Admitted Pro Hac Vice*
*\*\* Pro Hac Vice Application Pending*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

A.    DHHL and the Hawaiian Homes Commission................................. 2

B.    The Courtyards at Waipouli.............................................................. 3

C.    Linda Twitchell and David Kalahiki are Being Evicted From Their Homes Solely Because of Their Ancestry ................................................... 4

LEGAL STANDARD ....................................................................................... 7

ARGUMENT .................................................................................................... 8

I.    Plaintiffs are Likely to Prevail on the Merits ................................... 8

A.    The prohibitory injunction standard applies ......................... 8

B.    Evicting Plaintiffs based on ancestry violates the Fourteenth Amendment .............................................................................. 9

i.    Defendant Does Not Have a Compelling Interest to Justify Evicting Plaintiffs ................................................................. 11

ii.    Evicting Plaintiffs is Not Narrowly Tailored to Any Compelling Interest ............................................................. 14

II.    Plaintiffs Will Suffer Irreparable Harm if Evicted ....................... 18

III.    The Balance of Equities Weighs in Plaintiffs' Favor and Serves the Public Interest ................................................................................... 20

IV.    No Security Bond Should be Required ......................................................... 21

CONCLUSION ............................................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)..................................................................................11

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...............................................................7–8

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ...............................................................8–9

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ...............................................................20

*Burney v. Hous. Auth. Of Beaver Cnty.,*
  551 F.Supp. 746 (W.D. Pa. 1982)....................................................10, 12

*City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.,*
  473 U.S. 432 (1985)..................................................................................10

*City of Richmond v. J.A. Croson Co.*
  488 U.S. 469 (1989)....................................................................12, 14–15

*Coral Const. Co. v. King Cnty,*
  941 F.2d 910 (9th Cir. 1991) ..............................................................16–17

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ...............................................................20

*Drakes Bay Oyster Co. v. Salazar,*
  921 F.Supp.2d 972 (N.D. Cal. 2013)....................................................19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of
  Educ.,*
  82 F.4th 664 (9th Cir. 2023) ...............................................................8–9

*Fisher v. Univ. of Texas at Austin,*
  570 U.S. 297 (2013)..................................................................................14

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ....................................................................9

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .....................................................................8

*Gratz v. Bollinger*,
539 U.S. 244 (2003)..................................................................................14

*Grutter v. Bollinger*,
539 U.S. 306 (2003)............................................................................14, 17

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ...................................................................18

*Hirabayashi v. United States*,
320 U.S. 81 (1943)....................................................................................11

*Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local
No. 10*,
492 F.2d 929 (9th Cir. 1974) .....................................................................7

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) .................................................................21

*Johnson v. Macy*,
145 F.Supp.3d 907 (C.D. Cal. 2015) .......................................................19

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) .................................................................20

*Medrano-Rocha v. Santacruz*,
817 F.Supp.3d 871 (C.D. Cal. 2026) .........................................................7

*N.D. v. Reykdal*,
102 F.4th 982 (9th Cir. 2024) ....................................................................8

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*,
979 F.2d 721 (9th Cir. 1992) ...................................................................12

*Palmore v. Sidoti*,
466 U.S. 429 (1984)..................................................................................11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)......................................................................................13

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) ....................................................................19

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005) ......................................................................20

*Rice v. Cayetano*,
    528 U.S. 495 (2000)......................................................................................10

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ....................................................................20

*Sammartano v. First Judicial District Court, in and for County of
    Carson City*,
    303 F.3d 959 (9th Cir. 2002) ......................................................................20

*Shaw v. Hunt*,
    517 U.S. 899 (1996)......................................................................................12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    Coll.*,
    600 U.S. 181 (2023)...................................................................11, 13–14, 17

*Taylor-Failor v. Cnty. of Hawaii*,
    90 F.Supp.3d 1095 (D. Haw. 2015)............................................................22

*United States v. Paradise*,
    480 U.S. 149 (1987)..............................................................................12, 15–16

*United States v. Starrett City Associates*,
    840 F.2d 1096 (2d Cir. 1988) ................................................................10, 12

*Valenzuela v. Ducey*,
    329 F.Supp.3d 982 (D. Ariz. 2018) ............................................................18

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986)................................................................................12–13

*Youth 71Five Ministries v. Williams*,
    160 F.4th 964 (9th Cir. 2025) .......................................................................8–9

## Constitutional Provisions

Haw. Const. art. XII, § 2 ..................................................................................2

U.S. Const. amend. XIV ...................................................................9, 10, 19, 22

## Statutes

Hawaiian Homes Commission Act, 1920, ch. 42, 42 Stat. 108 (1921)............. 2-3, 5

## Rules

Fed. R. Civ. Proc. 65(c) ................................................................................21

**INTRODUCTION**

Plaintiffs David Kalahiki and Linda Twitchell are Hawaiʻi residents who have lived in apartments in the Courtyards at Waipouli in Kapaʻa, Kauaʻi for years. The Department of Hawaiian Home Lands ("DHHL") recently sent them eviction notices, ordering them to be out of their homes by July 31, 2026. The reason? Because David and Linda do not have the "correct" ancestry—they are not at least 50% native Hawaiian according to blood quantum.

Such brazen ancestry-based preferences cannot survive strict scrutiny under the Fourteenth Amendment's Equal Protection Clause, under which government classifications based on ancestry can only be upheld if they further a compelling interest and are narrowly tailored. Defendant Kali Watson, in his official capacity as Chairman of the Hawaiian Homes Commission, which oversees DHHL, cannot satisfy strict scrutiny here. The ancestry requirement does not remedy any specific instances of past discrimination against the favored group, and even if the decision to evict tenants like David and Linda was aimed at redressing past discrimination, DHHL's actions at the Courtyards at Waipouli are not narrowly tailored to any such interest. This Court should thus grant a temporary restraining order and enter a preliminary injunction prohibiting DHHL from evicting Plaintiffs on the basis of ancestry pending final resolution of this case.

1

## STATEMENT OF FACTS

**A.    DHHL and the Hawaiian Homes Commission**

Under supervision of the Hawaiian Homes Commission, DHHL is responsible for administering the Hawaiian Homes Commission Act of 1920. Hawaiian Homes Commission Act (HHCA), 1920, ch. 42, 42 Stat. 108 (1921). DHHL's primary duty is administering "certain public lands, called Hawaiian home lands, for homesteads."[1] *See also* Haw. Const. art. XII, § 2 ("the spirit of the Hawaiian Homes Commission Act" is to continue "Hawaiian homes projects for the further rehabilitation of the Hawaiian race"). The Hawaiian "home lands" consist of approximately 200,000 acres previously held by the Hawaiian monarchy and United States government, which DHHL leases for residential, agricultural, pastoral, and aquacultural purposes.[2] Only those who are "native Hawaiian, not less than eighteen years of age" are eligible for a lease. HHCA § 208(1). *See also id.* at § 207(a) (DHHL "is authorized to lease to native Hawaiians"). A "Native Hawaiian" is a "descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." *Id.* at § 201(a).

---

[1] *See* https://dhhl.hawaii.gov/dhhl/.
[2] *See* https://dhhl.hawaii.gov/dhhl/.

2

Even though eligibility for home lands leases is restricted, there is a waiting list that currently exceeds 30,000 people.[3] Some have been on the waitlist for decades. Others have died before their names were called.

In an effort to reduce the waiting list, Defendant Watson and DHHL have embarked on a mission to buy existing housing developments and offer residential units to those on the waiting list in lieu of a homestead lease. Notably, no express statutory authorization exists for DHHL to take these actions. Rather, DHHL is acting beyond the Hawaiian Home Commission Act's purpose, which is to "enable native Hawaiians to return to their lands in order to fully support self-sufficiency for native Hawaiians and the self-determination of native Hawaiians," as well as to preserve "the values, traditions, and culture of native Hawaiians." HHCA § 101.

**B.    The Courtyards at Waipouli**

In 2024, DHHL purchased an 82-unit private apartment complex, Courtyards at Waipouli, located on the island of Kauaʻi.[4] The purchase of the Courtyards at Waipouli is intended to serve as DHHL's first-ever rent-to-own program for native Hawaiians on the waitlist.[5] In November of 2025, DHHL began informing existing residents at the Courtyards at Waipouli that they would be evicted to make way for

---

[3] https://dhhl.hawaii.gov/dhhl/.
[4] https://dhhl.hawaii.gov/2025/11/16/dhhl-to-conduct-beneficiary-workshops-for-first-of-its-kind-affordable-rental-project-on-kauai/.
[5] *Id.*

new residents on DHHL's waitlist.[6] As a result, hundreds of people are being evicted from their homes solely because they are not at least 50% native Hawaiian.[7]

DHHL's relocation plan for existing residents of the Courtyards at Waipouli calls for serving 90-day eviction notices in batches of five households at a time in an attempt to not overload the limited housing market on Kaua'i.[8] Relocation packages include rental support for up to 42 months and help with moving costs, but this is of little comfort to the residents who wish to stay in their homes and not be singled out due to their ancestry.[9]

**C.    Linda Twitchell and David Kalahiki are Being Evicted From Their Homes Solely Because of Their Ancestry**

David Kalahiki is a Hawai'i resident who lives in the Courtyards at Waipouli on the island of Kaua'i. Declaration of David Kalahiki (Kalahiki Decl.) at 2. He has lived on Hawai'i all his life and moved into the Courtyards at Waipouli about two years ago. *Id*. at 3. David has a native Hawaiian blood quantum of about 25%, short of the 50% required by DHHL to stay in his home. *Id*. at 4. Because of this, David

---

[6] *Id*.; https://www.civilbeat.org/2025/12/kaua%CA%BBi-renters-are-fighting-a-hawaiian-homesteads-condo-project/.

[7] https://dhhl.hawaii.gov/2025/11/16/dhhl-to-conduct-beneficiary-workshops-for-first-of-its-kind-affordable-rental-project-on-kauai/.

[8] https://civilbeat.org/2025/12/kaua%CA%BBi-renters-are-fighting-a-hawaiian-homesteads-condo-project/; https://www.civilbeat.org/2024/02/kauai-may-lose-vital-workforce-due-to-dhhl-purchase/.

[9] Courtyards at Waipouli Relocation Plan, Prepared for Nalu Waipouli LLC on behalf of The Department of Hawaiian Home Lands, p. 19, https://www.waipoulifacts.org/relocationinfo.

is being evicted from his home. *Id*. David received a 90-day eviction notice on May 1, 2026. *Id*. at 5.

Being evicted would be extremely difficult for David and his wife. *Id*. at 6. They moved to the Courtyards at Waipouli after a devastating fire destroyed their home and possessions. *Id*. at 7. They intend to rent this apartment while their old home is rebuilt, but this has taken years with no end in sight. *Id*. David and his wife have no idea if or when they will be able to go back to their previous home. *Id*.

When they signed the lease, David and his wife were not notified that DHHL had plans to purchase the property or that they would be evicted. *Id*. at 8. Relocation assistance has been unhelpful, and they have not been able to find comparable housing. *Id*. at 9. David chose the Courtyards at Waipouli because of the rent rate and what it offered for that rate. *Id*. at 11. This allows David and his wife the financial ability to rent while waiting for the rebuilding of their previous home. *Id*. They also chose this apartment for its scenic and walkable location. *Id*.

David is frustrated that he is being evicted for not having a certain blood quantum. *Id*. at 12. He wishes to stay in his home unless and until he decides to voluntarily move. *Id*. at 13.

Linda Twitchell is a Hawaiʻi resident who lives in the Courtyards at Waipouli on the island of Kauaʻi. Declaration of Linda Twitchell (Twitchell Decl.) at 2. She has lived on Hawaiʻi since 2018 and moved into the Courtyards at Waipouli in

October of 2019. *Id.* at 3. Linda does not meet the native Hawaiian blood quantum, and for that reason, she is being evicted from her home. *Id.* at 4. Linda received an eviction notice on March 15, 2026 (Exhibit A to Twitchell Decl.), and has been ordered to vacate the premises by July 31, 2026. *Id.* at 5.

After receiving this eviction notice, Linda noticed that multiple maintenance issues have been ignored in her unit, and she was even told she would be financially responsible for fixes. *Id.* at 7.

Linda has undergone severe health issues and subsequent financial hardship that makes this eviction particularly burdensome. *Id.* at 8. Her extensive medications, specialists, rehabilitation, hospitalizations, nearly a dozen emergency visits, and travel for care have depleted her savings. *Id.* at 9. She continues to experience ongoing physical disabilities. *Id.* Linda has been advised to avoid stress and excessive exertion until at least the end of the year to recover from this health trauma. *Id.* at 10.

Living at the Courtyards at Waipouli is of extreme value to Linda for many reasons, especially because the rent is significantly lower than market rates, helping Linda during this financial hardship. *Id.* at 11. Linda also greatly enjoys the location of her apartment where she can walk to a mini mall and beach, which she uses frequently. *Id.* at 12. She also favors the manner in which the units are built. *Id.*

6

Being evicted from her home because she does not possess the required blood quantum deeply offends her. *Id*. at 14. Linda believes she should be treated equally regardless of ancestry, and that this property should be open to all. *Id*. She finds it deeply offensive that after years of protests by the Kaua'i community, a government agency chose to pit 50% blood-quantum Hawaiians against all other residents who desire the opportunity to live at the Courtyards at Waipouli. *Id*. at 15. She wishes to stay in her home unless and until she voluntarily chooses to leave. *Id*. at 16.

## LEGAL STANDARD

The purpose of a temporary restraining order (TRO) is simply to "protect the public welfare or preserve the status quo pending a hearing." *Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local No. 10*, 492 F.2d 929, 933 (9th Cir. 1974). The standard for issuing a TRO is the same as that for issuing a preliminary injunction. *Medrano-Rocha v. Santacruz*, 817 F.Supp.3d 871, 876 (C.D. Cal. 2026). Both are appropriate when the movant has established: (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities weighs in his favor; and (4) the injunction is in the public interest. *Id.*; *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citations omitted).

The Ninth Circuit also employs an alternative "serious questions" standard that allows these four elements to be "balanced, so that a stronger showing of one

element may offset a weaker showing of another." *All. for the Wild Rockies*, 632 F.3d at 1131. Therefore, a TRO and preliminary injunction may be awarded when there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff[.]" *Id.* at 1132 (internal citations omitted).

## ARGUMENT

### I.       Plaintiffs are Likely to Prevail on the Merits

#### A.      *The prohibitory injunction standard applies*

A preliminary injunction that "aims at 'simply maintaining the status quo'" is a "prohibitory injunction." *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024) (*quoting Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). In contrast, a "mandatory injunction" is one that "alters the status quo by requiring a party to take action." *Youth 71Five Ministries v. Williams*, 160 F.4th 964, 978 (9th Cir. 2025). The distinction between the two turns on "whether the party seeking the injunction seeks to alter or maintain the status quo," defined as "the legally relevant relationship between the parties before the controversy arose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (*quoting Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014)). Because mandatory injunctions are "particularly disfavored," they require the moving party to show that the "facts and law clearly favor" them. *Id.* (citations omitted).

Here, Plaintiffs seek a prohibitory injunction. The "legally relevant relationship" between Plaintiffs and Defendant before the controversy arose was Plaintiffs living in their homes without being subject to eviction because of their blood quantum. *See id.* at 684. The status quo ante litem is thus the situation where Plaintiffs are able to live in their homes without regard to blood quantum. *See Youth 71Five Ministries*, 160 F.4th at 978 (status quo defined as the situation "before the action challenged in the complaint occurred"); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024) ("The 'status quo ante litem' for preliminary injunction purposes 'refers not simply to any situation before the filing of a lawsuit, but instead to the "last uncontested status which preceded the pending controversy."'" (*quoting GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000))). Because Defendant "affirmatively changed this status quo" by sending eviction notices to Plaintiffs and deciding that all apartments in the Courtyards at Waipouli should only go to individuals with 50% native Hawaiian blood quantum, Plaintiffs seek a prohibitory injunction. *Ariz. Dream Act Coal.*, 757 F.3d at 1061. Plaintiffs therefore need not show the facts and law clearly favor their likelihood of success on the merits.

      B.    *Evicting Plaintiffs based on ancestry violates the Fourteenth Amendment*

Plaintiffs are likely to succeed in proving that Defendant's ancestry-based evictions violate the Equal Protection Clause. Under the Fourteenth Amendment,

"[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Plaintiffs thus have the right to remain in their homes free from consideration of their blood quantum. *See United States v. Starrett City Associates,* 840 F.2d 1096, 1100 (2d Cir. 1988) (use of racial quotas in allocation of public housing facilities based solely on race produces a "discriminatory effect . . . [that] could hardly be clearer") (*quoting Burney v. Hous. Auth. Of Beaver Cnty.*, 551 F.Supp. 746, 770 (W.D. Pa. 1982).

DHHL has established an express ancestry-based requirement for all those who live or seek to live in the Courtyards at Waipouli apartment complex.[10] "Ancestry can be a proxy for race" because "[a]ncestral tracing . . . achieves its purpose by creating a legal category which employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name." *Rice v. Cayetano*, 528 U.S. 495, 514, 517 (2000). As such, "race is treated as a forbidden classification [because] it demeans the dignity and worth of a person to be judged by ancestry." *Id.* "Distinctions between citizens solely because of their ancestry are by their very

---

[10]  https://dhhl.hawaii.gov/2025/11/16/dhhl-to-conduct-beneficiary-workshops-for-first-of-its-kind-affordable-rental-project-on-kauai/. While there is an income eligibility factor for moving into the apartments, this factor does not even apply unless the individual already satisfies the blood quantum requirement of at least 50% native Hawaiian.

nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). DHHL's decision to evict Plaintiffs because they lack a 50% native Hawaiian blood quantum is thus subject to strict scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny"). Strict scrutiny requires the government to prove that racial classifications are "narrowly tailored measures that further compelling government interests." *Id.*

> i.    Defendant Does Not Have a Compelling Interest to Justify Evicting Plaintiffs

The "core purpose" of the Equal Protection Clause is "'do[ing] away with all governmentally imposed discrimination based on race.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)). For that reason, "[e]liminating racial discrimination means eliminating all of it." *Id.* Following *Students for Fair Admissions*, only two compelling interests justify ancestry- or race-based government action: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," or (2) avoiding imminent risk of riots in a prison. 600 U.S. at 207. The latter is inapplicable here, and DHHL cannot satisfy its burden of establishing that evicting Plaintiffs from the Courtyards at Waipouli for lacking a 50% native Hawaiian blood quantum

11

remedies past discrimination. Such a showing would require that the government: (1) provide particularized findings of prior discrimination, and (2) have a "strong basis in evidence" to conclude that the remedial action was necessary before embarking on an "affirmative-action program." *Shaw v. Hunt*, 517 U.S. 899, 910 (1996) (*quoting Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986)).

First, DHHL has not made any findings of prior discrimination to justify evicting Plaintiffs from their homes, much less any "particularized" findings. *See id*. Examples of "particularized findings" that warranted remedial action include thirty-seven years of documented discrimination in promoting black state troopers and a failure to fix the issue for twelve years, *see United States v. Paradise*, 480 U.S. 149, 168–71 (1987), and specific prior discriminatory policies and conduct, coupled with continued evidence of discriminatory impact, *see Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 979 F.2d 721, 726 (9th Cir. 1992). This case comes nowhere close to the documented discrimination in *Paradise* and *Officers for Justice*. DHHL has not even bothered to make generalized assertions of discrimination against native Hawaiians warranting eviction of non-native Hawaiians from their homes. But even if it had, that too would be insufficient under strict scrutiny. *See City of Richmond v. J.A. Croson Co.* 488 U.S. 469, 498–99 (1989) (generalized assertions and amorphous claims of past discrimination are insufficient for remedial action). *Starrett City Associates* 840 F.2d at 1100 (*quoting Burney v.*

*Housing Auth.*, 551 F. Supp. 746, 770 (W.D. Pa. 1982). For DHHL to satisfy strict scrutiny, it must show that it is remedying past discrimination that violated the Constitution or a statute. *See Students For Fair Admissions*, 600 U.S. at 207 (collecting cases). Because it has not made such a showing, DHHL cannot satisfy strict scrutiny here.

Second, DHHL likewise has no "basis in evidence," much less a "strong" basis, that to remedy past discrimination, it is necessary to evict residents of the Courtyards at Waipouli, including Plaintiffs, to make way for residents with a 50% native Hawaiian blood quantum. *See Wygant v. Jackson Bd. Of Education* 476 U.S. 267, 277 (1986) (requiring a "strong basis" of evidence of discrimination for the government to employ remediation measures); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 755 (2007) (school districts lacked the specific findings of prior discrimination needed to establish a strong basis of evidence for racial remediation programs.).

Rather than meet its burden to provide the necessary evidence of the need to redress past discrimination, DHHL decided to buy the Courtyards at Waipouli and evict all residents without a 50% native Hawaiian blood quantum to ease the substantial waiting list for DHHL homestead leases.[11] But obtaining a slight

---

[11] Approval of Option to purchase Agreement Courtyard at Waipouli, Department of Hawaiian Homes Lands, https://dhhl.hawaii.gov/wp-content/uploads/2023/12/Item-C-1-Approval-of-Option-to-Purchase-Agreement-

reduction in a waiting list for a public benefit is not a compelling interest for purposes of the Equal Protection Clause. *See Students For Fair Admissions*, 600 U.S. at 207.

      ii.     Evicting Plaintiffs is Not Narrowly Tailored to Any Compelling Interest

Even if Defendant was able to provide a compelling interest in remedying past discrimination, imposing a discriminatory ancestry requirement and evicting Plaintiffs from their homes is not narrowly tailored to serve that interest. Narrow tailoring of race- and ancestry-based measures requires Defendant to give "serious, good faith consideration of workable race-neutral alternatives" that it can use to achieve its goals. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). A court cannot uphold discriminatory actions unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013). Indeed, "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (cleaned up).

In *J.A. Croson*, the Richmond City Council adopted a plan that required prime contractors on city construction contracts to subcontract at least 30% of the award

---

Courtyard-at-Waipouli-1.pdf (stating that the purchase is a "strategic move" to "diversify the housing options" of "DHHL's portfolio" for those on DHHL's waitlist. (p. 2).

amount to one or more minority businesses. *J.A. Croson Co.*, 488 U.S. at 477–78. In short, "[t]he Richmond Plan denie[d] certain citizens the opportunity to compete for a fixed percentage of public contracts based solely on their race." *Id.* at 493. Applying strict scrutiny, the Court held that the Richmond Plan was not narrowly tailored to remedy the effects of prior racial discrimination. *See id.* at 508. The Court found that "it [is] obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination" because the plan drew a rigid line based on a suspect classification instead of "tailor[ing] remedial relief to those who truly have suffered the effects of prior discrimination." *Id.* The Court noted that instead the city could have adopted race-neutral alternatives to address accessibility, including, "[s]implification of bidding procedures, relaxation of bonding requirements, and training and financial aid…." *Id.* at 509–10. But because the city did not consider these race-neutral alternatives and instead adopted a rigid racial set-aside, the Court found that the city's plan was not narrowly tailored.

By contrast, a race-conscious remedy can be narrowly tailored when it addresses specific instances of prior unlawful discrimination by a state actor. *See Paradise*, 480 U.S. at 166. In *Paradise*, The Court found that a one-black-for-one-white promotion requirement for state troopers was an appropriate interim remedy that was narrowly tailored. *Id.* at 153, 167. But in that case, unlike here, the government implemented that requirement to address a recent district court order

15

citing "pervasive, systematic, and obstinate discriminatory conduct" by the Alabama Department of Public Safety. *Id.* at 167. Because the Department had engaged in long-term systematic exclusion of black employees from promotions, the Court found that race-neutral alternatives would not achieve the purpose of eliminating the effects of the Department's racially discriminatory practices. *See id.* at 171–177 (considering race-neutral alternatives such as the imposition of fines on Defendant and a nondiscriminatory promotion procedure).

Further, "rigid numerical quotas" are rarely considered narrowly tailored. *See, e.g., Coral Const. Co. v. King Cnty*, 941 F.2d 910, 922, 924 (9th Cir. 1991). In *Coral Construction*, the Ninth Circuit considered a contracting program that established a preference for minority-owned businesses and women-owned businesses. *Id.* at 914. In order to be narrowly tailored, the Ninth Circuit explained that a race-conscious program should first consider race-neutral alternatives, set goals on a case-by-case basis rather than employing rigid quotas, and be limited in scope. *Id.* at 922.

Here, Defendant's actions are not narrowly tailored to address specific instances of unlawful discrimination by a state actor as in *Paradise*. Further, Defendant did not employ or consider race-neutral alternatives. Instead, Defendant is conducting blanket eviction of tenants based on ancestry, based on an arbitrary blood quantum, without any regard to whether those evictions will remedy intentional discrimination at the hands of the State. Rather than considering any

16

ancestry-neutral criteria, DHHL *requires* tenants at the Courtyards at Waipouli to possess a 50% native Hawaiian blood quantum.[12] And Plaintiffs are being evicted precisely because they lack the necessary blood quantum. *See id*. Defendant's actions amount to an explicit preference for a racial group, not a narrowly tailored effort to advance a compelling government interest.

DHHL's ancestry mandate also violates "the twin commands of the Equal Protection Clause": that race "may never be used as a 'negative'" and that it "may not operate as a stereotype." *Students for Fair Admissions*, 600 U.S. at 218. DHHL is punishing individuals who do not meet the blood quantum requirement by kicking them out of their homes. Through these actions, DHHL is using ancestry as a negative—if you don't have the "right" ancestry, you are evicted. Ancestry is also being used as a stereotype. DHHL's actions suggest that all Hawaiians with at least 50% native Hawaiian blood quantum need subsidized housing. This is a baseless and arbitrary stereotype, violating the second command of the Equal Protection Clause.

Finally, race-conscious government programs must have a "'logical end point.'" *Students for Fair Admissions, Inc.*, 600 U.S. at 221 (*quoting Grutter*, 539 U.S. at 342). Given that DHHL's acquisition of the Courtyards at Waipouli is to create a rent-to-own project, and that all residents will receive a 99-year DHHL

---

[12] https://dhhl.hawaii.gov/2025/11/16/dhhl-to-conduct-beneficiary-workshops-for-first-of-its-kind-affordable-rental-project-on-kauai/.

residential homestead lease that is inheritable by certain relatives who also possess the required blood quantum, there is no measurable end goal, or stopping point for the discriminatory ancestry-based decision to evict Plaintiffs and their neighbors who lack the 50% native Hawaiian blood quantum. [13]

Because Defendant cannot demonstrate a compelling government interest and has not narrowly tailored the ancestry requirement and evictions, Plaintiffs are likely to prevail on their claim that being evicted from their home because they lack the required blood quantum violates the Equal Protection Clause.

## II.    Plaintiffs Will Suffer Irreparable Harm if Evicted

Plaintiffs will suffer irreparable harm if they are evicted from their homes because of their ancestry. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (citations omitted). Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore constitute irreparable harm. *Valenzuela v. Ducey*, 329 F.Supp.3d 982, 997 (D. Ariz. 2018). A constitutional violation alone can suffice to show irreparable harm. *Id.* Thus, as discussed above, if Plaintiffs are evicted, they will suffer the

---

[13] *See* slideshow presentation at https://dhhl.hawaii.gov/2025/09/29/waipouli-project-lease-selection/. Even if the 99-year lease is considered a "logical end point," it is not a reasonable one that is appropriately designed to remedy identified racial discrimination.

irreparable harm of the violation of their constitutional right to equal protection under the Fourteenth Amendment.

Additionally, in the Ninth Circuit, "it is well-established that the loss of an interest in real property constitutes an irreparable injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011). Eviction causes immediate, non-speculative disruption to a person's life, including the severance of strong ties to the community and friendships established with neighbors. *Johnson v. Macy*, 145 F.Supp.3d 907, 920 (C.D. Cal. 2015). In *Johnson*, the court found that wrongful eviction would constitute an irreparable harm even though the plaintiff was renting the property because "if [the plaintiff] was evicted and an innocent third party rents the property, the court is not authorized to return [the plaintiff] to her original home." *Id.* at 920. Accordingly, "wrongful eviction is not an injury for which remedies available at law are adequate." *Id.* The unique nature of real property contributes to this irreparable injury. *Drakes Bay Oyster Co. v. Salazar*, 921 F.Supp.2d 972, 994 (N.D. Cal. 2013).

Such is the case for Linda and David who have lived in their homes for years, and due to the uniqueness of each home, will be unable to find suitable replacements. Once they are evicted and another tenant moves in, their homes are forever gone, causing permanent, irreparable harm. This harm is imminent—David and Linda face

19

eviction proceedings at the end of this month, and DHHL has not budged on its July 31, 2026, eviction date.

### III. The Balance of Equities Weighs in Plaintiffs' Favor and Serves the Public Interest

The final two elements for preliminary relief merge when the government is the defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). "The balance of equities and public interest thus tip sharply in favor of enjoining" action when challenging government action that affects the exercise of constitutional rights. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). The government "cannot suffer harm from" a preliminary action that "merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The Ninth Circuit "*presume[s]* that a constitutional violation causes a preliminary injunction movant irreparable harm and that preventing a constitutional violation is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023). Courts have also consistently recognized the significant public interest in protecting constitutional rights. *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) ("[It] is always in the public interest to prevent the violation of a party's constitutional rights." (quote omitted)); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Here, the balance of the equities and the public interest weigh heavily in favor of protecting Plaintiffs' constitutional right to equal protection. The public also has very little interest in forcing Plaintiffs out of their homes in violation of their constitutional rights, and adding to the already strained housing market of Kaua'i. Given the imminent July 31 eviction date, a temporary restraining order and preliminary injunction will enable Plaintiffs to remain in their homes while their constitutional claims are fully evaluated and decided.

## IV.   No Security Bond Should be Required

This Court should waive any requirement that a security bond be posted because Defendant will not be harmed by any improvidently issued restraint. The Court has wide discretion as to the amount of security, if any, required pursuant to Federal Rule of Civil Procedure 65(c). *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal citations omitted). Courts may waive the bond entirely when there is no realistic likelihood of harm to the defendant from enjoining its conduct. *Id.*

Enjoining Defendant from evicting Plaintiffs during this litigation will not harm Defendant's ability to continue DHHL's regular work on homestead leases. Given the absence of harm to Defendant, the Court should not require Plaintiffs to post a security bond.

Additionally, the security bond may be waived when constitutional rights are implicated and involve the public interest. *Taylor-Failor v. Cnty. of Hawaii*, 90 F.Supp.3d 1095, 1102 (D. Haw. 2015). This Court should waive the bond requirement here because Plaintiffs seek vindication of the right to equal protection under the Fourteenth Amendment.

## CONCLUSION

This Court should grant Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and enjoin Defendant from evicting Plaintiffs from their homes pending resolution of this case.

Dated: July 28, 2026

Respectfully submitted,

THE LAW OFFICE OF KEVIN O'GRADY, LLC

 s/ Kevin O'Grady
KEVIN O'GRADY, Hawaii Bar #8817
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
Telephone: (808) 521-3367
kevin@kevinogradylaw.com

PACIFIC LEGAL FOUNDATION

CALEB R. TROTTER
Cal. Bar #305195*
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

NOELLE DANIEL, Kan. Bar #29461*
CAITLYN FELLNER, D.C. Bar
#90029259**
Pacific Legal Foundation

22

3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
NDaniel@pacificlegal.org
CFellner@pacificlegal.org

*\* Admitted Pro Hac Vice*
*\*\* Pro Hac Vice Application Pending*

*Attorneys for Plaintiff*

23